UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ZEN-NOH GRAIN CORPORATION ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> SADOT LATAM LLC ) <br> ) <br> Defendant. ) <br> ) | C.A. No. <br> Rule 9(h) Admiralty Claim |

**VERIFIED COMPLAINT IN ADMIRALTY**

Plaintiff, Zen-Noh Grain Corporation ("**ZGC**"), files this Verified Complaint in Admiralty against Sadot Latam LLC, stating admiralty and maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure ("Supplemental Rules for Admiralty and Maritime Claims"), and alleges as follows:

**PARTIES**

1. Plaintiff is a Louisiana business corporation with the domicile address and principal office address at 1127 Hwy 190 East Service Road, Covington, Louisiana, 70433.

2. On information and belief, Defendant is a Delaware limited liability company with the registered address at 251 Little Falls Drive, Wilmington, Delaware, 19808.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1333(1) because this action is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Rule B(1)(a) of the Supplemental Rules for Admiralty and Maritime Claims.

1

## FACTS GIVING RISE TO MARITIME CLAIMS

**The Shipment of the Cargo**

5.  Pursuant to a sale contract dated May 9, 2024 and agreed through brokers BlueFin Agro LLC, ZGC agreed to sell and Sadot or Sadot Group Inc., in the alternative ("**Sadot**"), agreed to purchase 27,500MT (10% more or less at vessel's option) of Argentine soybean meal (the "**Cargo**"), for the total purchase price of $12,263,787.48 (the "**Sale Contract**").

6.  The terms of the Sale Contract are contained in the main terms bearing the number BA240601, which incorporate a standard contract No. 39 prepared by the Grain and Feed Trade Association ("**GAFTA**") and the GAFTA Arbitration Rules. A true and correct copy of the Sale Contract and correspondence evidencing Sadot's acceptance of its terms are attached hereto as *Ex. 1*.

7.  The main terms of the Sale Contract described in paragraph 6 above read as follows in the pertinent part:

> **Loading port**: One safe Upriver port / One safe berth, but not above Timbues (excluding Villa Constitución, San Nicolás and San Pedro), at Seller´s option to be declared upon vessel´s nomination. …
>
> **Price**: USD 17 per short ton over July 2024 Soybean meal futures CBOT to be converted into US dollar per metric ton. …
>
> **Delivery**: June 1-30 - Both dates included. …
>
> **Payment**: 10% payment down by latest Tuesday May 14, 2024. 90% Cash against faxed/scanned copies of documents within 48 hours as per Gafta 39 documents. …
>
> **Destinations excluded**: Iran, Syria and China.
>
> All terms, conditions and rules not in contradiction with the above, contained in GAFTA contract number 39 – including the arbitration rules no. 125 – in force this day, of which the parties admit to have knowledge and notice, apply to this contract and details given above shall be taken as having been written into such contract form in the appropriate place.

8. The terms of the GAFTA contract No. 39 described in paragraph 6 above read as follows to the extent relevant:

> **11. PAYMENT**
> **(a) Payment** …Title to the goods shall not pass from Sellers to Buyers until full and final payment has been received….
>
> **25. ARBITRATION**
> (a) Any and all disputes arising out of or under this contract or any claim regarding the interpretation or execution of this contract shall be determined by arbitration in accordance with the GAFTA Arbitration Rules, No 125, in the edition current at the date of this contract, such Rules are incorporated into and form part of this Contract and both parties hereto shall be deemed to be fully cognisant of and to have expressly agreed to the application of such Rules….
>
> (c) Nothing contained under this Arbitration Clause shall prevent the parties from seeking to obtain security in respect of their claim or counterclaim via legal proceedings in any jurisdiction, provided such legal proceedings shall be limited to applying for and/or obtaining security for a claim or counterclaim, it being understood and agreed that the substantive merits of any dispute or claim shall be determined solely by arbitration in accordance with the GAFTA Arbitration Rules, No 125.

9. On May 15 and 16, 2024, Sadot paid ZGC $1,166,000 as advance payment of a part of the purchase price for the Cargo.

10. The total purchase price for the Cargo as between ZGC and Sadot was $12,263,787.48.

11. The Cargo had been purchased by ZGC from an entity called Fisway S.A., which in turn had purchased it from COFCO International Argentina S.A. ("**COFCO**"), an Argentine exporter of soybean meal and shipper of the Cargo.

12. On information and belief, Sadot entered into a sub-sale contract to resell the Cargo to Nuval Trade S.A. ("**Nuval**"), a Swiss trading entity.

13. On information and belief, Nuval entered into a further sub-sale contract to further resell the Cargo to KATCO Trading and Contracting s.a.r.l, an entity based in Lebanon.

14. On information and belief, Nuval is a charterer of the M/V BRILLIANCE (IMO 9450715) (the "**Vessel**"), which it chartered on or about April 30, 2024, among other things to carry the Cargo from Argentina to Lebanon.

3

15. On information and belief, the registered owner of the Vessel is Brilliant Maritime Ventures S.A., a Panamanian entity (the "**Shipowners**").

16. On May 23, 2024, Sadot instructed that bills of lading to be issued upon dispatch of the Cargo should reflect Beirut, Lebanon as the destination and that the notify party for the Cargo should be KATCO.

17. On information and belief, the Cargo was loaded on board the Vessel on or about July 3, 2024 in Argentina.

18. Three original ocean bills of lading were issued in respect of the Cargo (totalling 29,162.000 metric tonnes) by WBL Shipping Agency on behalf of the Vessel's Master (the "**Bills of Lading**"). True and correct copies of the Bills of Lading in ZGC's possession are attached hereto as *Ex. 2*.

19. On July 5, 2024, WBL communicated to ZGC that the Vessel's estimated time of arrival in Lebanon was August 8, 2024.

20. On July 11, 2024, at the direction of its seller Fisway S.A., ZGC paid directly to COFCO Resources SA (a member of COFCO International) the full price of $12,833,029.72 for the Cargo.

21. On July 16, 2024, COFCO therefore handed over the three original Bills of Lading into ZGC's possession, via an agency based in Argentina.

22. On or about July 15, 2024, ZGC emailed to Sadot (through brokers Blue Agro) the scanned copies of the Bills of Lading.

23. However, ZGC remains the sole and lawful holder of the three original Bills of Lading and the Bills of Lading remain in its possession.

24. On July 27, 2024, ZGC received a message from WBL confirming that the Vessel's estimated time of arrival in Lebanon was August 3, 2024.

**Sadot's Failure to Pay, Misrepresentations, and Diversion of the Cargo to Syria**

25. On July 18, 2024, in accordance with the Sale Contract with Sadot, the balance of the price of the Cargo ($11,097,787.48) became due to ZGC. Sadot failed to pay such balance by the due date.

26. On information and belief, on or about August 3, 2024, ZGC found out through its broker BlueAgro that on August 2, Sadot had ordered its buyers (Nuval) and the Shipowners to "refrain from entering any port, including the destination port (Beirut, Lebanon), and to refrain from discharging or delivering the cargo until we have accredited the payment into our bank account, the original [bills of lading] are presented to the vessel's Master, and Buyers receive formal written authorization from us authorizing the delivery of the cargo" (even though the Cargo was destined to Lebanon). Copies of Sadot's correspondence are attached as *Ex. 3 and 4*.

27. Sadot's orders to the Shipowners were labelled "Notice retaining cargo delivery" and required the Shipowners to confirm that they "will not discharge the cargo upon presentation of any documents other than the original [bills of lading' and Sellers' [i.e. Sadot's] written authorization". *Ex. 4*.

28. In turn, Sadot's orders to Nuval were labelled "Notice to retain delivery" and required Nuval to "affirm that Buyers [i.e. Nuval] will not discharge the cargo until Buyers fulfill their obligations as per the governing contract". *Ex. 3*.

29. Strikingly, in both notices Sadot expressly and repeatedly represented itself to be "*legitimate Bill of Lading (B/L) holders, and sole owners of the cargo*". *Ex. 3 and 4*.

30. As of August 2 and 3, 2024 and to this date, ZGC was and continues to be the lawful holder of the Bills of Lading and the sole owner of the Cargo, as ZGC retains title under the Sale Contract until full payment from Sadot.

5

31. On information and belief, on August 4, 2024, ZGC learned that while passing by Larnaca, Cyprus, the Vessel stopped reporting its location via its AIS transponder.

32. On information and belief, shortly thereafter, ZGC learned that port officials heard VHF transmission of the Vessel requesting entry into Port of Tartous, Syria (instead of proceedings to the discharge port in Lebanon).

33. Following a phone call on August 5, 2024, Sadot communicated to ZGC a proposed repayment schedule, stating that it is "committed on making full payment" of the remainder of the purchase price (although the table below did not reflect the full outstanding balance), as follows:

| 5-Aug | $ 900,000.00 |
| 9-Aug | $ 1,100,000.00 |
| 16-Aug | $ 1,500,000.00 |
| 23-Aug | $ 1,500,000.00 |
| 30-Aug | $ 1,700,000.00 |
| 6-Sep | $ 2,000,000.00 |

34. Sadot then stated that "[g]oing forward we will overly communicate and update payments and vessel situation".

35. On information and belief, on or about August 7, 2024, ZGC discovered through the Syrian lawyers appointed by its cargo insurers that according to the local declaration of arrival, the Vessel did arrive in Tartous, Syria. A copy of the arrival declaration is attached hereto as *Ex. 5*.

36. On information and belief, further indications received by ZGC through its cargo insurers confirmed that the Vessel remained off the coast of Tartous, Syria as of August 13 and 18, 2024.

37. On information and belief, on August 27, 2024, a local marine engineer and surveyor Mr. Tariq Mustafa confirmed that the Vessel continues to be in Tartous, Syria and not in Lebanon. A copy of the affidavit is attached hereto at *Ex. 6*.

38. On information and belief, on August 31, 2024, the Port of Beirut likewise certified that the Vessel had not called in Beirut during 2024. A copy of the certification is attached hereto at *Ex. 7*.

39. Meanwhile, between July 31 and September 6, 2024, Sadot only paid ZGC $2,850,000 out of the full outstanding balance ($11,097,787.48), without providing any explanation for the delays and the insufficient amounts of payment.

40. On September 3, 2024, ZGC learned that Sadot once again sent a message to the Shipowners regarding delivery of the Cargo. A copy of that message is attached as *Ex. 8*.

41. In that message, Sadot again expressly represented itself "[a]s the sole owners of the cargo currently on board MV BRILLANCE and the rightful holders of the original Bill of Lading", ordered the Shipowners to "refrain from discharging even a single metric ton of the loaded cargo" and required that the Shipowners do not enter Lebanese waters (even though the Cargo was in fact destined for Lebanon). *Id.*

42. Due to Sadot's blatant misrepresentations and failure to pay the balance of the price for the Cargo despite commitments to make full payment, as well as the Vessel's sudden diversion to Syrian waters, on September 6, 2024, ZGC sent a letter of demand to Sadot. The true and correct copy of the letter of demand is attached hereto as *Ex. 9*.

43. In the letter, ZGC demanded that Sadot repay the balance of the purchase price ($8,181,563.03) plus interest, cease misrepresenting itself as the owner of the Cargo and the holders of the Bills of Lading, and instruct the Vessel to proceed to a discharge port permitted by the Sale Contract. *Id.*

44. Since September 6, 2024, ZGC received no further payments or communications from Sadot, including any response to the letter of demand.

45. On September 12, 2024, having heard nothing from Sadot, ZGC commenced arbitration against Sadot under the Sale Contract under the GAFTA Arbitration Rules in London, England.

46. At the date of this Verified Complaint in Admiralty, the arbitral tribunal in the GAFTA arbitration is not yet fully constituted.

47. On information and belief, on September 16, 2024, ZGC further learned from what appears to be the finance department of Nuval that Nuval had paid to Sadot the sum of $11,062,896.30 for the Cargo.

48. On information and belief, Nuval had made multiple payments to Sadot in tranches over the period between March 8 and August 13, 2024, said by Nuval to include all payments for the Cargo to be carried on board the Vessel. Copies of the relevant correspondence from Nuval and what appear to be payment remittances to Sadot are attached as *Ex. 10*.

49. On information and belief, Nuval made two of these to Sadot, on May 9, 2024 in the sum of $1,000,000 and on May 14, 2024 in the sum of $300,000. *Id.*

50. On May 15 and 16, 2024, Sadot paid ZGC $1,166,000 as advance payment of a part of the purchase price for the Cargo.

51. The timing of these payments corroborates Nuval's assertion that it made the relevant payments with respect to the Cargo to be carried on board the Vessel.

52. On information and belief, many of the other payments by Nuval to Sadot described in *Ex. 10* contain the same reference as these two payments.

53. On information and belief, the payment reference is to the Cargo to be carried on board the Vessel, as it is for the same cargo quantity, origin, product, and sale type.

54. On information and belief, despite receiving payment from Nuval, Sadot withheld the funds from ZGC and failed to make payment for the Cargo.

55. On information and belief, after Sadot had received the $ 1.3 million from Nuval on May 9 and 14, 2024, Sadot received a further sum or around $8,731,646.30 from Nuval and only paid a fraction of this to ZGC.

56. Sadot did not even pay the full amounts it apparently received for the Cargo from Nuval through to ZGC.

57. On information and belief, as examples, Sadot received payments from Nuval which were not paid through to ZGC at all:

   a. on May 16, 2024, in the sum of $1,500,000;

   b. on May 22, 2024, in the sum of $800,000; and

   c. on May 28, 2024, in the sum of $1,500,000.

58. On information and belief, as to partial payments passed through to ZGC:

   a. On July 18 and August 1, 2024, Sadot received $1,700,000 and $600,000 respectively from Nuval and on July 31 and August 5, 2024, only paid $1,000,000 and $900,000 respectively to ZGC.

   b. On August 5, 2024, Sadot received $850,000 from Nuval and on August 7, 2024 only paid $150,000 to ZGC.

   c. On August 7 and 9, 2024, Sadot received two payments of $650,000 from Nuval and on August 13, 2024, only paid $500,000 to ZGC.

   d. On August 13, 2024, Sadot received $481,646.30 from Nuval and on August 21, 2024, only paid $300,000 to ZGC.

59. Sadot failed to pass through funds to ZGC to comply with its own proposed repayment schedule, in which it "committed on making full payment", as described in paragraph 33 above, despite receiving substantial funds from Nuval.

9

60. On information and belief, around September 12, 2024 and shortly after Sadot ceased making payment or responding to ZGC, Sadot Group Inc announced the launch of a new trading subsidiary called Sadot Canada Inc.

61. On information and belief, Sadot Canada is now also active in the trading of agricultural products from certain countries in Latin America.

62. At the date of this Verified Complaint in Admiralty, as a result of Sadot's actions described above, ZGC has sustained loss in the principal amount of $8,181,563.03, together with interest, costs and attorney's fees.

63. At the date of this Verified Complaint in Admiralty, the exact location of the Vessel is unknown to ZGC. On information and belief, the Vessel appears to still be in Syria or Syrian waters.

64. At the date of this Verified Complaint in Admiralty, ZGC is unaware of the current status of the Cargo or its whereabouts.

65. At the date of this Verified Complaint in Admiralty, ZGC remains the sole and lawful holder of the original Bills of Lading and the Bills of Lading remain in its possession.

66. At the date of this Verified Complaint in Admiralty, ZGC remains the sole owner of the Cargo.

## COUNT I - MARITIME FRAUD

67. Paragraphs 1 through 66 of this Verified Complaint in Admiralty are repeated and realleged as if the same were set forth here at length.

68. During the Vessel's voyage, Sadot made false representations that they are the "legitimate Bill of Lading holders" and "sole owners" of the Cargo on board the Vessel.

69. On information and belief, Sadot knew or believed that these representations were false or had an insufficient basis to make these representations.

70. At all pertinent times and to Sadot's knowledge, ZGC remained and still remains the sole and lawful holder of the original Bills of Lading, and the Bills of Lading remain in its possession.

71. At all pertinent times and to Sadot's knowledge, ZGC remained and still remains the sole owner of the Cargo, still believed to be on board the Vessel.

72. Sadot made these false representations to Nuval, the apparent charterers of the Vessel and subsequent buyers of the Cargo from Sadot.

73. On information and belief, Sadot made these false representations to portray itself as the true holder of the ocean Bills of Lading and as the sole owner of that Cargo on board the Vessel, and to induce Nuval to pay to Sadot the price for that Cargo.

74. On information and belief, following Sadot's false representations, Sadot obtained payment of the price for the Cargo from Nuval.

75. Sadot made false representations regarding its ability and willingness to pay the full purchase price for the Cargo to ZGC.

76. On information and belief, Sadot knew or believed that these representations were false or had an insufficient basis to make these representations.

77. On information and belief, Sadot made these false representations to delay ZGC from taking necessary action to recover the price for the Cargo carried on board the Vessel.

78. On information and belief, Sadot failed, refused to pay to, or withheld the relevant funds from ZGC.

79. As a result of Sadot's actions described above, ZGC sustained losses or damages in the sum of at least $8,181,563.03, together with interest, costs and attorney's fees.

**COUNT II – MARITIME CONVERSION**

80. Paragraphs 1 through 66 of this Verified Complaint in Admiralty are repeated and realleged as if the same were set forth here at length.

81. During the Vessel's voyage, Sadot made false representations that they are the "legitimate Bill of Lading holders" and "sole owners" of the Cargo on board the Vessel.

82. On information and belief, Sadot knew or believed that these representations were false or had an insufficient basis to make these representations.

83. At all pertinent times and to Sadot's knowledge, ZGC remained and still remains the sole and lawful holder of the original Bills of Lading and the Bills of Lading remain in its possession.

84. At all pertinent times and to Sadot's knowledge, ZGC remained and still remains the sole owner of the Cargo, still believed to be on board the Vessel.

85. Sadot made these false representations to the Shipowners of the Vessel.

86. On information and belief, Sadot made these false representations to portray itself as the true holder of the ocean Bills of Lading and as the sole owner of that Cargo on board the Vessel, and to induce or order the Shipowners not to discharge the Cargo anywhere without Sadot's consent, including at its port of destination in Lebanon.

87. On information and belief, the Shipowners did not discharge the Cargo at its destination port in Lebanon.

88. At the date of this Verified Complaint in Admiralty, the exact location of the Vessel is unknown to ZGC. On information and belief, the Vessel appears to still be in Syria or Syrian waters.

89. In acting as described above, Sadot unlawfully and wrongfully exercised dominion, ownership or control over ZGC's property, located on navigable waters, to the exclusion of the same rights by ZGC.

90. As a result of Sadot's actions described above, ZGC sustained losses or damages in the sum of at least $8,181,563.03, together with interest, costs and attorney's fees.

## COUNT III – MARITIME TORTIOUS INTERFERENCE WITH CONTRACT

91. Paragraphs 1 through 66 of this Verified Complaint in Admiralty are repeated and realleged as if the same were set forth here at length.

92. During the Vessel's voyage, Sadot made false representations that they are the "legitimate Bill of Lading holders" and "sole owners" of the Cargo on board the Vessel.

93. On information and belief, Sadot knew or believed that these representations were false or had an insufficient basis to make these representations.

94. At all pertinent times and to Sadot's knowledge, ZGC remained and still remains the sole and lawful holder of the original ocean Bills of Lading and the Bills of Lading remain in its possession.

95. At all pertinent times and to Sadot's knowledge, ZGC had a maritime contract of carriage of the Cargo by sea with the Shipowners, evidenced by the ocean Bills of Lading.

96. At all pertinent times and to Sadot's knowledge, ZGC remained and still remains the sole owner of the Cargo, still believed to be on board the Vessel.

97. Sadot made these false representations to the Shipowners of the Vessel.

98. On information and belief, Sadot made these false representations to portray itself as the true holder of the ocean Bills of Lading and as the sole owner of that Cargo on board the Vessel, and to induce, order or direct the Shipowners not to discharge the Cargo anywhere without Sadot's consent, including at its port of destination in Lebanon.

99. On information and belief, the Shipowners did not discharge the Cargo at its destination port in Lebanon.

100. At the date of this Verified Complaint in Admiralty, the exact location of the Vessel is unknown to ZGC. Upon information and belief, the Vessel appears to still be in Syria or Syrian waters.

101. In acting as described above, Sadot intentionally interfered with ZGC's maritime contract with the Shipowners for the ocean carriage of the Cargo, located in navigable waters.

102. As a result of Sadot's actions described above, ZGC sustained losses or damages in the sum of at least $8,181,563.03, together with interest, costs and attorney's fees.

## SUPPLEMENTAL RULE B ALLEGATIONS

103. Paragraphs 1 through 102 of this Verified Complaint in Admiralty are repeated and realleged as if the same were set forth here at length.

104. As set forth above, the Sale Contract between ZGC and Sadot provides for arbitration in London, England under the GAFTA Arbitration Rules. *Infra,* ¶¶6- 7.

105. Regardless of whether ZGC's claims asserted in this Verified Complaint in Admiralty fall within the scope of that arbitration clause, ZGC expressly reserves all its rights to arbitrate its claims in England.

106. ZGC reserves all rights to seek increased security as may be needed in this proceeding. Likewise, ZGC reserves all rights to seek and recover the full amount of its losses, damages, attorneys' fees, costs, interest, and other expenses in arbitration in England.

107. ZGC brings this action solely to obtain *quasi in rem* jurisdiction over Sadot and to secure the claims more fully described above.

108. Upon information and belief, and after investigation, Sadot cannot be found within this District within the meaning of Supplemental Rule B for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("**Supplemental Rule B**"). *See* Declaration of Samuel P. Blatchley dated September 23, 2024, submitted herewith and made a part hereof.

109. ZGC is accordingly entitled to attach and garnish Sadot's property within this District pursuant to the provisions of Supplemental Rule B.

110. Upon information and belief, Sadot has or will have during the pendency of this action, property within this District and subject to the jurisdiction of this Court.

111. Upon information and belief, Sadot's property subject to attachment and garnishment and located within the District are attached hereto as *Ex. 10* and includes, but is not limited to, a bank account located in Providence, Rhode Island.

112. Upon information and belief, Sadot received payment of the funds for the Cargo in that bank account from Nuval, while failing, refusing to pay to, or withholding funds from ZGC.

113. ZGC seeks an Order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Supplemental Rule B, attaching, *inter alia*, any assets of Sadot located within the District, including the assets identified in *Ex. 10* hereto, for the purpose of obtaining *quasi in rem* jurisdiction over Sadot and to secure ZGC's claims, as described above.

**WHEREFORE**, Plaintiff prays for the following:

(A) That process in due form of law issue against Defendant citing it to appear and answer the matters alleged in this Verified Complaint in Admiralty, failing which default judgment be entered against it in the sum of $8,181,563.03 plus any applicable attorneys' fees, costs and interest to which Plaintiff may be entitled, whether in equity or at law;

(B) That since Defendant cannot be found within this District pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, the Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Supplemental Rule B, attaching all property, goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any funds

    up to the amount of $8,181,563.03, belonging to, due or being transferred to, from or for the benefit of Defendant, including, but not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Rule B answer the matters alleged in this Verified Complaint in Admiralty;

(C) That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

(D) That this Court recognize and confirm any award(s) or judgment(s) rendered on the claims against Defendant currently pending, or which may be initiated in the future, including in any appeals, as a judgment of this Court;

(E) That this Court award Plaintiff the attorneys' fees and costs incurred in this action as applicable, and any applicable interest; and

(F) For such other and further relief as the Court deems just and proper.

| | |
|---|---|
| Date: September 24, 2024 | Respectfully submitted,<br><br>ECKLAND & BLANDO LLP<br><br>/s/Samuel P. Blatchley<br>Samuel P. Blatchley (RI Bar No. 8284)<br>22 Boston Wharf Road, 7th Floor<br>Boston, MA 02210<br>(617) 217-6936<br>sblatchley@ecklandblando.com<br><br>FLOYD ZADKOVICH (US) LLP<br><br>Edward W. Floyd<br>Luke F. Zadkovich<br>Filipp A. Vagin<br>33 East 33rd Street, Suite 905<br>New York, NY, 10016<br>ed.floyd@floydzad.com<br>luke.zadkovich@floydzad.com<br>philip.vagin@floydzad.com<br>(917) 999 6914<br>(917) 868 1245<br>*Attorneys for Plaintiff*<br>*(Pending Pro Hac Vice Admission)* |

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2024, I e-mailed the within document with the Clerk of the Court using address rid_ecf_intake@rid.uscourts.gov to file under seal.

/s/ Samuel P. Blatchley
Samuel P. Blatchley

## **VERIFICATION**

Pursuant to 28 U.S.C. 1746, Mathew J. Crain declares as follows:

1. I am Senior Counsel of Plaintiff, Zen-Noh Grain Corporation, and have been so affiliated at all times referred to in the foregoing Verified Complaint in Admiralty.

2. I have read the foregoing Verified Complaint in Admiralty and know the contents thereof.

3. I verify that I believe the allegations contained therein to be true to my own knowledge, except as to matters stated to be upon information and belief, and as to those matters I believe them to be true.

4. The grounds for my belief are based upon my personal knowledge gained during the course of my professional duties as Senior Counsel and my review of and familiarity with correspondence and other relevant documents, including the exhibits to the foregoing Verified Complaint in Admiralty.

5. I am authorized to make this verification on behalf of Plaintiff.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 23, 2024, in Covington, Louisiana.

_____
Matthew J. Crain